# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LAWRENCE AARON BLOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-07-1304-F |
| | ) | |
| PRE-PAID LEGAL SERVICES, INC., | ) | |
| an Oklahoma Corporation, and | ) | |
| HARLAND STONECIPHER, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Before the court is Defendants' Motion for Summary Judgment, filed November 9, 2009 (doc. no. 92). Plaintiff has responded and defendants have replied. Upon due consideration of the parties' submissions, the court makes its determination.

<u>Introduction</u>

Plaintiff, Lawrence Aaron Block ("Block"), originally commenced this action against defendants, Pre-Paid Legal Services, Inc. ("Pre-Paid") and Harland Stonecipher ("Stonecipher"), on November 16, 2007. Block filed an amended complaint on January 4, 2008 alleging various claims against Pre-Paid and Stonecipher. Shortly thereafter, Pre-Paid and Stonecipher moved for partial dismissal of the amended complaint. On March 14, 2008, the court entered an order granting that motion in part and denying it in part. Based upon the court's March 14th order, the following claims alleged by Block against Pre-Paid and Stonecipher in the amended complaint remain pending: (1) defamation against Pre-Paid and Stonecipher; (2) tortious interference with business relationships or prospective economic

advantage against Pre-Paid and Stonecipher; (3) breach of contract against Pre-Paid; and (4) negligence against Pre-Paid and Stonecipher. In the present motion, defendants now seek summary judgment in their favor on all of Block's remaining claims.

Standard of Review

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Relevant Facts

The following facts, based upon the record before the court, are either undisputed or viewed in a light most favorable to Block, the non-moving party.

In 1998, Block and Pre-Paid entered into an "Associate Agreement," under which Block would serve as an associate for Pre-Paid.[1] The Associate Agreement includes and incorporates certain "Policies and Procedures." Paragraph 1 of the Policies and Procedures states:

> An Associate is an independent business person and does not hold a franchise or a distributorship from [Pre-Paid] . . . . An Associate is not an employee for federal tax purposes or any other purposes. An Associate is neither an agent, partner, nor involved in a joint venture with [Pre-Paid] . . . .The Associate shall not enter into any agreements or make any purchases in the name of [Pre-Paid]. . . .

Ex. 1 to defendants' motion. Paragraph 12 of the Policies and Procedures states:

> An Associate agreement with [Pre-Paid] may be terminated for reasons including but not limited to: . . .(D) immediately by [Pre-Paid] with just cause, including but not limited to: . . . proselytizing [Pre-Paid] Associates into any other organization . . . .

*Id.* Paragraph 13 of the Policies and Procedures states:

> Advance commissions for sales produced by the Associate or in the Associate's downline shall be earned only as fees on products/services are earned. Any sums advanced to the Associate shall create a liability (debit balance) of the Associate to [Pre-Paid] which will normally be charged back against earned commissions. The Company reserves the right to pay commissions on an as earned basis on any application or group of applications that the company can not verify. A commission advance adjustment calculated on the average debit balance of cancelled memberships as of

---

[1] According to the amended complaint and answer to the amended complaint, Pre-Paid sells legal expense plans pursuant to which plan purchasers receive services from provider law firms. Pre-Paid relies upon its associates to market these legal expense plans. The associates are paid commissions resulting from the sale of the legal expense plans. Associates may also receive commissions based upon sales generated by other persons. *See*, doc. no. 11, ¶ 2; 5 doc. no. 27, ¶ 2; 5.

the 25th of each month will be recovered from advance commissions. An Associate may request commissions be paid on less than a 100% advance basis.

*Id*. Paragraph 17 of the Policies and Procedures states:

[Pre-Paid] reserves the right at any time to no longer accept new business from any Associate, and to adjust or change any marketing plan and incentive program at any time without notice.

*Id*.

Pre-Paid has an unwritten policy and practice of placing its associates on "hold" when that is deemed necessary by Pre-Paid management. Ex. 2 to defendants' motion, pp. 48 - 50. According to John Long ("Long"), a vice president of Pre-Paid, the "most prevailing" reason he would put an associate on hold "is cross-recruiting, protecting the sales force." Ex. 2 to defendants' motion, p. 24, ll. 22-24. When a hold is in place, Pre-Paid restricts the associate's access to confidential company information, accepts no new business from the associate and refuses to provide advance commissions to the associate.

On January 9, 2007, Block was placed on hold by Pre-Paid.[2] In response to an e-mail from Block, Long, in an e-mail dated January 10, 2007, wrote: "You've been temporarily placed on 'hold' while we research your situation. There is concern that you've gone to another network marketing company/companies." Ex. 3 to plaintiff's response.[3] Block, in response to Long's e-mail, advised that he had recently looked at

_____

[2] Block was not advised by Pre-Paid that he was to be placed on hold. After noticing that he was not being paid commissions, he contacted the company and was told he had been placed on hold. Ex. 2 to plaintiff's response, p. 13, ll. 24-25, p. 14, ll. 1-7.

[3] Block also had telephone conversations with Long regarding the hold. In one telephone conversation, Long told him that he had been placed on hold because of accusations from the field of cross-recruiting. Block testified in deposition that he did not recall whether the telephone conversation preceded any of the e-mails with Long. Ex. 2 to plaintiff's deposition, p. 14, ll. 24-25, p. 15, ll. 19. Block also testified that Long told him that his ex-wife, Fariba Dadko, was the person who turned Block into Pre-Paid. She called Pre-Paid and advised Pre-Paid that Block had sent out

a travel company[4] and asked for clarification as to exactly what he did and the grounds for losing his income.  *Id*.  Long then replied to Block writing:

> You're currently on "hold."  To be clear, you've not lost any income.  We've temporarily halted these payments from being made.  If/when we remove the "hold," all accrued commissions will immediately be paid.
>
> \*     \*     \*     \*
>
> To help speed this process up, I'll ask you directly:  Are you marketing or building an organization in any other network marketing company?"

*Id*.  Block responded to this e-mail writing:

> \*     \*     \*     \*
>
> Is telling a [friend] or a relative who has nothing to do with [Pre-Paid] building an organization?
>
> Is belonging to another organization grounds for losing my income?  I was not aware of that.  In fact, [I've] see many examples to the contrary.
>
> Are you saying that if I belong to this travel thing and tell anyone about it, I am not welcome in [Pre-Paid] and will lose my income and residual?
>
> I read my associate agreement yesterday and nowhere does it say that.

---

an e-mail trying to recruit one or more Pre-Paid associates into YTB.  Ex. 8 to defendants' motion, p. 71, ll. 21-25, p. 72, ll. 1-21, Ex. 2 to plaintiff's response, p. 47, ll. 20-23.

[4] Block joined a travel company, YTB, via the internet, on November 24, 2006.  Block's relationship with YTB was that of an Independent Travel Agent and Marketing Representative.  *See*, Ex. 3 to defendants' motion, p. 2.  YTB was a multi-level marketing company.  Ex. 8 to defendants' motion, p. 22, ll. 1-3.  Block established a website for YTB on November 24, 2006.  *Id*. at p. 25, ll. 17-23.

*Id*. Long then sent a e-mail to Block wherein he cut and pasted "the applicable policy:"

> 20. An Associate may not proselytize, recruit or solicit in any manner any [Pre-Paid] Associate, including without limitation his or her first line, into any other company or organization, during the term of the Associate Agreement and for 2 years after the date of any termination hereof.

*Id*. After a couple more e-mail exchanges, Block wrote:

> I have not decided yet whether I'm going to build [an organization] in another company.
>
> That's why I'm waiting to get clarification from [Pre-Paid] regarding its policy on this matter.
>
> The section 20 does not address whether it is ok for prepaid associates to be involved in another networking company as long as they don't try and recruit any [Pre-Paid] associates[.]
>
> Can you please make it clear as to what the rules are here .
> . . .

*Id.* In response, Long wrote:

> My personal opinion is it's practically impossible to build another organization – in another MLM – without having some cross-recruiting occur, even if it's unintentional.
>
> That said, I'm removing you from "hold."
>
> Assuming you decide to go ahead with YTB, please understand the company will aggressively and quickly protect ourselves and our sales force if/when we confirm any cross-recruitment.

*Id.* Block was taken off administrative hold on January 11, 2007.[5] Block was subsequently paid all advances that he would have received during the two-day period he was on hold.

Approximately four months later, on May 3, 2007, Pre-Paid again placed Block on hold.[6] According to Long, there had been "[c]ross-recruiting complaints." Ex. 10 to defendants' motion.[7] In an e-mail to Block on May 9, 2007, Long wrote:

> As much disdain as I have for this process, I hope you'll understand we will always take a "defensive" stance when it comes to such allegations. To put an account on "hold' does nothing, really, other than puts everything in neutral until we can ascertain what, if anything, has occurred. It's a bit McCarthyistic, but there's no better way to protect the company.
>
> Your association with YTB will always lend itself to some question . . . . But when we hear complaints, we're going to have to react a certain way.

Ex. 5 to defendants' motion. Pre-Paid released Block from hold on May 10, 2007. Block was subsequently paid all advances he would have received during the seven-day period he was on hold.

---

[5] In his deposition, Long testified as follows about removing the hold:

> There were allegations. There wasn't anything immediately forthcoming that I had requested. So knowing what I knew about his personal situation, I instructed marketing to remove him from hold.

Ex. 1 to plaintiff's response, p. 121, ll. 14-18.

[6] Block discovered he had been placed on hold by calling the company. Ex. 8 to defendants' motion, p. 73, ll. 10-21.

[7] In his deposition, Block testified that in regard to the specifics of the complaints, he had been told by Long that he had recruited "someone named Sam, Sam Abrams, or Abramson, or Abraham, something like that." Ex. 8 to defendants' motion, p. 86, ll. 5-12. Block testified that he never met "Samuel Abraham." Ex. 2 to plaintiff's response, p. 121, l. 25, p. 122, l. 1.

Approximately four months later, on September 5, 2007, Fariba Dadko ("Dadko"), Block's ex-wife, sent an e-mail to Stonecipher advising him that her team and many of her colleagues' organizations in Pre-Paid had been solicited into another network company, called YTB. Ex. 6 to defendants' motion. In the letter, Dadko specifically stated that she had lost Larry Zimberg to YTB and that he had been recruited by Block.[8] *Id.* She also advised that she was solicited by a former Pre-Paid "leader/up-line," Ben Kane, to look at YTB. Dadko urged Pre-Paid to take a more serious and aggressive approach to "such threats, solicitations and cross-recruiting." *Id.* Pre-Paid placed Block on hold on September 9, 2007.

Block was not advised by the company that he was on hold or told why he was on hold. When he attempted to learn whether and why he was on hold, the only information he was given was that "Pre-Paid wanted me to know [that] no one will talk to me." Ex. 2 to plaintiff's response, p. 116, ll. 3-7. Two days later, on September 11, 2007, Block retained counsel, who sent a letter to Pre-Paid demanding its performance of obligations under the Associate Agreement and requesting adequate assurances that Pre-Paid intends to perform its duties under the Associate Agreement. Counsel advised Pre-Paid that failure to provide adequate assurance of its intent to perform would result in an "anticipatory repudiation of the contract by your company." Ex. 7 to defendants' motion. Counsel further advised that failure to respond to the demand would result in further legal action. *Id.*

---

[8] In his response, Block acknowledges that the e-mail was sent to Stonecipher but specifically objects to the admission of Dadko's statement in the letter that Larry Zimberg "was recruited into YTB by Lawrence Block, a current associate of [Pre-Paid]." Block objects to the statement under Fed. R. Evid. 801 and 802. Block also objects to Dadko's statement on the basis that there is no evidence that Dadko had any personal knowledge of the allegation. The court, however, concludes that the statement is admissible and may be offered for summary judgment purposes in that the statement is not being offered for the truth of the matter asserted. It is being offered to show that Pre-Paid received a complaint which alleged that Block had recruited Larry Zimberg to YTB. The receipt of the complaint resulted in Pre-Paid placing Block on hold.

On November 16, 2007, Block initiated litigation against Pre-Paid and Stonecipher. Block has remained on hold since September 9, 2007. The Associate Agreement has not been terminated by Pre-Paid.

Each time Block was placed on hold, an "H" was placed by his name in his on-line associate file. Pre-Paid associates in Block's up-line as well as corporate officers and directors had access to Block's on-line associate file. Two associates in Block's up-line, Craig Hefner and Sherrell Stecki, telephoned Block to inquire about the hold and to express their concerns about him cross-recruiting.

According to Block, being placed on hold implied that an associate committed "a very serious wrongdoing." Ex. 2 to plaintiff's response, p. 31, ll. 13-16.

Block testified that he received an e-mail from Zimberg in which Zimberg said that he had heard that Block was doing something new and he wanted to know what it was. Ex. 2 to plaintiff's response, p. 23, ll. 12-15. At the time, Zimberg was an active Pre-Paid associate. *Id*., ll. 16-18. Block called Zimberg in response to the e-mail and talked to him once or twice. *Id*., p. 23, ll. 19-21; p. 24, ll. 22-24. Zimberg signed up for YTB on Block's website and was in Block's down-line. *Id*., p. 24, ll. 1-5; p. 25, ll. 14-16. Block thinks Zimberg signed up with YTB before January 11, 2007. *Id*., p. 24, ll.18-21.

Defamation Claim

According to defendants, Block has identified one specific statement which he contends was defamatory: that Pre-Paid caused an "H" to be placed next to his name as displayed on Pre-Paid's internal computer network, thereby communicating to Pre-Paid officers and associates that he had been placed on hold. Defendants contend that this challenged statement cannot support a defamation claim under Oklahoma law. First, defendants assert that the challenged statement is not false because Block was placed on hold. Second, defendants assert that the statement that Block was on hold

is not defamatory. Defendants contend that Pre-Paid places associates on hold for many reasons and the fact that a person has been placed on hold does not rise to the level of malice, illegality, contempt, etc. required to state a claim for libel under Oklahoma law. Third, defendants contend that the intra-corporate privilege rule precludes a finding that the statement was published. Defendants point out that the "H" designation was only accessible by Pre-Paid officers and associates. Because the statement was only accessible by Pre-Paid personnel, defendants contend that the statement was not published to a third party as required by Oklahoma law and thus cannot support a defamation claim.

Block, in response, argues that the statement was false and defamatory. According to Block, when Pre-Paid places an associate on hold, that action has a decidedly negative meaning in the eyes of the associates. Block argues that being placed on hold means that the associate has committed very serious wrongdoing. Block points out that two of the associates in his up-line called him in response to the "H" designation and told him they had been told by Pre-Paid that Block was cross-recruiting. Because the "H" designation meant that Block had committed very serious wrongdoing, Block contends that a defamatory statement was made by Pre-Paid and Stonecipher. In addition, Block contends that the intra-corporate privilege does not apply because Pre-Paid associates are not employees, agents or partners of Pre-Paid. By virtue of the associate agreements, the associates are independent contractors and statements made to them constitute statements to a third party. Further, Block contends that summary judgment is not appropriate because the evidence obtained during discovery has revealed that Pre-Paid made other defamatory statements about Block. Block asserts that the evidence shows that Pre-Paid told the mother of one of his prospective clients, Lawrence Turner, that Block was no longer with the company, even though he had not been terminated. Pre-Paid also told associates in Block's up-line that he was cross-recruiting. Block therefore argues that

he is entitled to proceed on his defamation claim and that defendants' motion should be denied.

In reply, Pre-Paid and Stonecipher assert that while Block has tried to explain in his response why the "H" statement was defamatory, he has failed to address the most obvious flaw of the defamation claim: that the statement was true. Defendants point out that Block must show that the statement was both false and defamatory and that because Block was in fact placed on hold, he cannot show that the statement was false. In addition, defendants argue that, under Oklahoma law, the intra-corporate privilege does extend to communications with independent contractors. Defendants therefore contend that Block cannot establish the essential element of publication in support of his defamation claim. Further, defendants argue that Block may not rely on the statement to the mother of the prospective client to support the defamation claim, or on any statements of Pre-Paid revealed by the up-line associates, because those statements were never identified during discovery. Pre-Paid and Stonecipher contend that, in any event, these statements cannot support a defamation claim because (i) the statements constitute inadmissible hearsay, (ii) the statements made to the up-line associates were not published, (iii) the statement to the prospective client was not defamatory and (iv) Block cannot prove special damages.

At the outset, the court concludes that plaintiff may not rely upon the evidence of statements made to the up-line associates, Craig Hefner and Sherrell Stecki, or on the statement made to Turner's mother to maintain the defamation claim. The evidence of these statements come from the deposition testimony of Block. According to Block, Hefner told Block that people at the Pre-Paid office told Hefner that Block was cross-recruiting. Also, Stecki told Block that Long had accused Block of "stealing people away." Plaintiff's response, at 21. Further, Turner's mother told Block that Pre-Paid told Turner's mother that Block was no longer working at the company. Block's testimony is hearsay because Block offers it for the truth of the statements made – *viz.,*

Hefner, Stecki and Turner's mother's statements that Pre-Paid employees actually made those comments about Block. Rule 801(c), Fed. R. Civ. P.; <u>Starr v. Pearl Vision, Inc.</u>, 54 F.3d 1548, 1555 (10th Cir. 1995). Although Hefner and Stecki are associates of Pre-Paid, the evidence in the record shows that they are not agents of Pre-Paid. Their statements to Block are not admissions by a party opponent so as to qualify as non-hearsay, *see*, Rule 801(d)(2)(D), Fed. R. Evid. Block may not rely on inadmissible hearsay statements contained in depositions to overcome summary judgment. <u>Starr</u>, 54 F.3d at 1555. The court therefore concludes that defendants are entitled to summary judgment as to the defamation claim to the extent that it is based upon testimony of Block as to statements purportedly made by Pre-Paid employees to Hefner, Stecki and Turner's mother.

As to the "H" designation next to Block's name in his on-line associate's file, the court finds that that statement, at least when challenged under Rule 56, can support a claim for defamation. Libel is a form of defamation, which requires "(a) a false and defamatory statement concerning another, (b) an unprivileged publication to a third party, (c) fault amounting at least to negligence on the part of the publisher, and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." <u>Bird Const. Co., Inc. v. Oklahoma City Housing Authority</u>, 110 P.3d 560, 564 (Okla. Civ. App. 2004). "A publication is libelous *per se* if it "'exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation . . . .'" <u>Gaylord Entertainment Co. v. Thompson</u>, 958 P.2d 128, 146 (Okla. 1998) (quoting 12 O.S. 1991 § 1441.) To determine whether a publication is libelous *per se*, the court must measure the writing by its natural and probable effect upon the persons to whom it is addressed. *Id.*; *see also*, <u>Fite v. Oklahoma Pub. Co.</u>, 293 P. 1073, 1075 (Okla. 1930). A writing is actionable *per se* when the language used is susceptible of but a single meaning that is opprobrious. <u>Gaylord Entertainment Co.</u>,

958 P.2d at 147. In contrast, a publication is libelous *per quod* if the words are reasonably susceptible of both a defamatory and an innocent meaning. *Id*. This latter form of libel requires proof by extrinsic facts to show a defamatory meaning. *Id*. Whether a writing is libelous *per se* presents an issue of law for the trial court's resolution. *Id*.

The court concludes that the "H" designation by Block's name is not libelous *per se*. The designation by itself is not capable of having only a single, opprobrious, meaning. The designation by itself does not injure Block in his occupation. However, the court concludes that there is sufficient evidence in the record, viewed in a light most favorable to Block, to raise a fact issue as to whether the "H" designation is libelous *per quod*. Block has presented evidence that the "H" designation implies that an associate has committed serious wrongdoing. There is also evidence that the "H" designation was placed by Block's name because of cross-recruiting allegations. Long testified that the prevailing reason he places an associate on hold is for cross-recruiting. The court concludes that the evidence, viewed in a light most favorable to Block, shows that the "H" designation has a defamatory meaning in the context in which it was used. Although defendants have argued that the evidence establishes that Block was cross-recruiting, specifically, cross-recruiting Larry Zimberg, the court concludes that Block has proffered sufficient evidence to raise a genuine issue of material fact as to whether he was cross-recruiting. The court therefore concludes that there is a genuine issue of material fact as to whether this designation conveyed a defamatory falsehood.

The court disagrees with defendants' contention that, as a matter of law, the "H" designation was not published. Defendants have cited Thornton v. Holdenville General Hosp., 36 P.3d 456, 461 (Okla. Civ. App. 2001) and Ishmael v. Andrew, 137 P.3d 1271, 1276 (Okla. Civ. App. 2006), in support of their position that the intra-corporate privilege extends to communications with independent contractors, such as Block's up-

line associates. Those cases are distinguishable from the case at bar. In each cited case, the court found the existence of an agency relationship between the corporation and the independent contractors. Thornton, 36 P.3d at 461 ("[T]here is no dispute that Gould was contractually responsible for the physician staffing of Hospital's emergency room. In this context, Gould was Hospital's agent. As a result, any statements made between Hospital's employees and Gould's representatives, at least within that agency relationship, were protected by the intra-corporate privilege . . . ."); Ishmael, 137 P.3d at 1276 ("At the time of the investigation, Andrew was an attorney working for Nordam. The rule that intra-corporate communications are not published for slander purposes applies to employees and agents, which would include Andrew, a private investigator, a stenographic reporter, and Andrew's office employees, all agents hired by Nordam to investigate the contamination of its employee's drink.") Here, we do not have evidence showing the existence of an agency relationship between defendants and the up-line associates to whom the communications were made. The court concludes that sufficient evidence in the record exists to raise a genuine issue of material fact as to the publication element of Block's defamation claim.

As previously stated, Block has alleged the defamation claim not only against Pre-Paid but also against Stonecipher. Although the court finds sufficient evidence for the defamation claim to proceed against Pre-Paid, the court concludes that summary judgment is appropriate as to the defamation claim against Stonecipher. The court finds that Block has failed to proffer adequate evidence to demonstrate that Stonecipher was involved in the placement of the "H" designation next to Block's name. The only evidence Block submits in support of the defamation claim against Stonecipher is that Stonecipher received an e-mail in September 2007 from Block's ex-wife concerning Block's alleged recruitment of Larry Zimberg into YTB and that Block was subsequently placed on hold. The court concludes that this evidence is not sufficient to demonstrate that Stonecipher made the decision or was involved in any

way in the decision to place the "H" designation by Block's name after receipt of the September 2007 e-mail from Block's ex-wife.[9]

In sum, the court concludes that summary judgment is appropriate as to Block's defamation claim against Stonecipher and as to Block's defamation claim against Pre-Paid based upon purported statements made to Hefner, Stecki and Turner's mother. The court concludes that summary judgment is not appropriate as to Block's defamation claim against Pre-Paid based upon the "H" designation.

Tortious Interference Claim

In its March 14, 2008 order, the court granted defendants' partial motion to dismiss as to Block's claim that Pre-Paid and Stonecipher tortiously interfered with his contractual or business relationship with Pre-Paid but denied defendants' partial motion to dismiss as to Block's claim that Pre-Paid and Stonecipher tortiously interfered with plaintiff's business relationship with, or prospective economic advantage from, a "business enterprise involving the travel industry which afforded excellent economic opportunities for both the present and future." *See*, Order, doc. no. 26, p. 2. In reaching its decision as to the former claim, the court concluded that neither Pre-Paid nor Stonecipher was a third party with respect to plaintiff's business or contractual relationship with Pre-Paid against whom a tortious interference claim could be made. *Id*.

Pre-Paid and Stonecipher contend that during discovery, the only relationships identified by Block as the subjects of his tortious interference claim are relationships involving actual or potential sales of *Pre-Paid* products. They assert that no lost sales involving Block's travel business with YTB have been identified. Therefore, based

---

[9]In his papers, Block notes that Stonecipher's deposition had been cancelled and was not taken. Block, however, did not seek relief under Rule 56(f), Fed. R. Civ. P., to facilitate the taking of the deposition of Stonecipher prior to a ruling on defendants' motion.

upon the court's March 14th order and the arguments and authorities cited in their partial motion to dismiss, defendants contend that they are entitled to summary judgment on the tortious interference claim.

In response, Block asserts that the court's decision to grant dismissal of plaintiff's tortious interference claim relating to his contract or prospective economic relations with Pre-Paid was correct in that under Oklahoma law a party cannot tortiously interfere with its own contract or prospective contractual relation. However, Block argues that when negotiating the contracts pursuant to his Associate Agreement, Block was not acting as an agent of Pre-Paid but was, instead, acting on his own behalf as an independent contractor. Block argues that when Pre-Paid told the mother of his prospective client, Lawrence Turner, that Block no longer worked for the company and directly signed him up as a member, Pre-Paid tortiously interfered with Block's prospective contractual relationship with Turner.

Defendants, in reply, assert that Block's argument ignores the court's March 14th order as well as the reality of the contractual relationships at issue. According to defendants, there is no contractual relationship between Block and Pre-Paid members. Block provides no products or services to the members and they pay Block no money. Rather, Pre-Paid asserts that it sells the products and services to the members, and the members pay Pre-Paid. If a member enters into a contract with Pre-Paid as a result of Block's sales efforts, Pre-Paid pays Block a commission. The argument that Pre-Paid is an outsider to the relationship, defendants assert, is not supported by the evidence.

The court concludes that defendants are entitled to summary judgment on the tortious interference claim. Block has not presented any evidence to support his tortious interference claim to the extent it is based upon relationships involving the travel business. It appears that Block's tortious interference claim is based upon Pre-Paid's conduct in advising the mother of Lawrence Turner that Block was no longer working for the company, and then directly signing Turner as a member. The

court concludes that this tortious interference claim is deficient as a matter of law. Block has failed to show that Pre-Paid is an outsider to the prospective contractual relationship with Turner. Any contractual relationship relating to the legal expense plans would have been between Turner and Pre-Paid. Block would not have provided Turner with any service or product. He would only have presented the service or product to Turner. The evidence shows that it is Pre-Paid that provides the products and services to its members. Block closes a sale and makes a commission as a result of his efforts. The commission, however, is paid by Pre-Paid and not the member. Therefore, any profit obtained by Block as a result of his sales effort would come from Pre-Paid and not Turner. Because Pre-Paid is not an outsider to the prospective business relationship involving Turner, the court finds that Pre-Paid is entitled to summary judgment on the tortious interference claim.

As to Block's tortious interference claim against Stonecipher, the court also finds that summary judgment is appropriate. Aside from the matters discussed above, there is no evidence in the record that Stonecipher was involved in any way in advising Turner's mother that Block no longer worked for the company and in directly selling the membership to Turner. The court concludes that plaintiff has failed to present sufficient evidence to establish a tortious interference claim against Stonecipher.

Summary judgment is appropriate as to Block's tortious interference claim against both Pre-Paid and Stonecipher.

Breach of Contract Claim

Pointing out that the gist of Block's contract claim is that Pre-Paid breached the Associate Agreement by placing Block on hold, thereby refusing to accept new business from or to advance commission payments to him, Pre-Paid contends that it is entitled to summary judgment because the Associate Agreement expressly states that Pre-Paid may stop accepting new business from an associate at any time. It also argues

that the decision to advance commissions is entirely discretionary and nothing in the Associate Agreement obligates Pre-Paid to make such advances. Further, Pre-Paid argues that the Associate Agreement provides that Pre-Paid may terminate the agreement at any time for just cause, including, but not limited to, the soliciting of other Pre-Paid Associates. Pre-Paid contends that the evidence shows that Block had direct communications with Pre-Paid associates about YTB, that he maintained a website about YTB which discussed YTB and provided a means for people to join YTB, some of the Pre-Paid associates with whom he discussed YTB were "signed up" into YTB through Block's website, and these associates were placed in Block's downline at YTB. Based upon this evidence, Pre-Paid contends that its actions with respect to Block could not have amounted to a breach of the agreement. Pre-Paid argues, in essence, that because it had the right to terminate Block under the agreement, the right to terminate surely included the lesser act of putting Block on hold.

Block, in response, contends that there was no contractual basis for Pre-Paid placing an associate on hold due to allegations of wrongdoing. Block asserts that the Associate Agreement makes it clear that he is not an employee of Pre-Paid and that Pre-Paid is not free to do as it chooses with respect to its associates. Block maintains that the Associate Agreement does not give Pre-Paid the right to put its associates on hold. He asserts that Pre-Paid breached the contract by withholding Block's earned commissions, attempting to thwart his efforts to investigate other business opportunities, using his commissions to pay for Pre-Paid legal fees, and placing him on hold without any legitimate basis. Although Pre-Paid claims that it had the right to terminate him, Block points out that the contract was never terminated. What the contract does not allow, Block argues, is the imposition of the "McCarthyistic" hold on the associate. Block therefore contends that Pre-Paid is not entitled to summary judgment on the breach of contract claim.

In reply, Pre-Paid contends that the substantive components of the hold process, and the ones relied upon by Block to recover damages, are the refusal to accept new business and to advance commissions to the associate. Pre-Paid points out that under the Associate Agreement, it may in fact stop accepting new business from an associate at any time and stop advancing commissions at any time. Thus, even though the Associate Agreement does not define the actions as a hold, those actions are authorized by the agreement. Pre-Paid contends that the exercise of these rights did not constitute a breach of the agreement. Further, Pre-Paid contends that Block has presented no evidence that he was denied any earned commissions. Although Pre-Paid declined to pay Block advance (unearned) commissions during the time periods he was on hold, Pre-Paid never withheld earned commissions from Block. Pre-Paid also argues that there has been no evidence that Pre-Paid thwarted Block's efforts to investigate other business opportunities. Moreover, Pre-Paid contends that there is no provision in the agreement which addresses Block's rights or Pre-Paid's obligations with respect to other business opportunities. Pre-Paid further argues that there is no evidence that Pre-Paid used his earned commission to pay Pre-Paid's legal fees. Finally, Pre-Paid contends that it was not a breach of the Associate Agreement to let others know that Block had been placed on hold because there is no provision requiring Pre-Paid to maintain confidentiality regarding the status of an associate.

The court, upon careful consideration of the record, concludes that Block has failed to establish a submissible claim that Pre-Paid breached the Associate Agreement by placing Block on hold three times. Although the contract does not address the practice of placing an associate on hold, the evidence shows, and the parties agree, that the effect of the hold was to refuse new business from an associate and to decline to pay advance commissions to the associate. The Associate Agreement, as pointed out by defendants, specifically reserves the right of Pre-Paid to decline to accept new business from an associate at any time. *See*, Ex. 1, ¶ 17 ("[Pre-Paid] reserves the right

at any time to no longer accept new business from any Associate.")  There is no condition precedent in the agreement which must be satisfied before Pre-Paid may choose not to accept an associate's new business.  Thus, the refusal to accept new business is authorized by the Associate Agreement.  As to the decision not to provide advance commissions, the Associate Agreement does not obligate Pre-Paid to pay advance commissions.  Moreover, under the agreement, advance commissions are not earned until the fees on the products are actually received.  *See*, *id*., ¶ 13 ("Advance commissions for sales produced by the Associate or in the Associate's downline shall be earned only as fees on products/services are earned.")  The Associate Agreement also provides that if an advance is paid to an associate, the associate owes the unearned portion of the advance until it is fully earned.  *Id*. ("Any sums advanced to the Associate shall create a liability (debit balance of the Associate to [Pre-Paid] which will normally be charged back against earned commissions.")  The court therefore concludes that by placing Block on hold, thereby refusing new business and declining to pay advance commissions, Pre-Paid did not breach the Associate Agreement.

In his papers, Block asserts that Pre-Paid breached the Associate Agreement by "withholding Mr. Block's earned commissions."  *See*, plaintiff's response, p. 29. However, the court finds that Block has failed to present sufficient evidence to raise a genuine issue of material fact as to whether Block was denied earned commissions. Block also asserts that defendants breached the Associate Agreement by "attempting to thwart his efforts to investigate other business opportunities."  *Id.*  However, the court finds no provision in the Associate Agreement which addresses Block's rights or Pre-Paid's obligations with regard to Block's pursuit of business opportunities.  The record does not reveal evidence supporting a submissible contract claim on that  basis. Block further asserts that Pre-Paid breached the Associate Agreement by "using his commission to pay for [Pre-Paid's] legal fees."  *Id*.  The court, however, finds that Block has failed to present evidence sufficient to raise a genuine issue of material fact

that Pre-Paid used Block's earnings to pay legal fees. Finally, Block asserts that defendants breached the Associate Agreement by "placing him on extra-contractual administrative 'hold' without any legitimate basis." *Id*. However, as previously discussed, Pre-Paid's conduct in placing Block on hold did not constitute a breach of the Associate Agreement. The court therefore concludes that Pre-Paid is entitled to summary judgment on the breach of contract claim.

Negligence Claim

In the March 14, 2008 order, the court concluded that a claim of negligence could be reasonably inferred from Block's allegations in the amended complaint "that defendants knew or should have known that plaintiff was not contractually prohibited from attempting to engage his colleagues, associates, friends and members in any business other than Pre-Paid when he was no longer associated therewith; that defendants were mistaken or negligent in representing to such individuals that plaintiff's actions were illegal and in violation of his agreements with Pre-Paid; and that plaintiff was injured in his new ventures as a result." *See*, Order, doc. no. 26, p. 5.

Defendants, in the present motion, contend that Block is not pursuing the negligence theory stated by the court. Rather, Block has explained in discovery that his negligence claim is based on the allegation that Pre-Paid placed him on hold when there was no reasonable basis for believing that he had cross-recruited Pre-Paid associates into another company. Because that claim is not the one permitted by the court's March 14th order, defendants contend that summary judgment should be granted. However, even if the claim were permitted by the court's order, defendants contend that Pre-Paid acted correctly in placing Block on hold. Pre-Paid received complaints that Block was cross-recruiting and there was a reasonable basis for putting Block on hold while the complaints were investigated.

Block, in response, contends that he is pursuing a negligence theory on the basis that Pre-Paid and Stonecipher were negligent in attempting to stop Block from engaging in another non-competing business venture, were negligent in telling Pre-Paid associates and others that his actions were in violation of the Associate Agreement, and in placing him on administrative hold without a shred of credible evidence that he had violated any term of the Associate Agreement. Block contends that the evidence shows that Long used the "McCarthyistic" administrative hold to keep Block from pursuing other business opportunities. Block contends that the evidence also shows that Long placed Block on hold three times without conducting even the simplest of investigations and placed Block on hold based solely on gossip and innuendo. Block asserts that defendants were reckless in deciding to tell other Pre-Paid associates and customers that Block was in violation of the agreement. He also asserts that Pre-Paid owed him a duty not to besmirch his professional character and to conduct a reasonable investigation into the allegations against him before cutting off his commissions and impairing his ability to earn a living.

In reply, defendants argue that the negligence claim permitted by the court in its March 14th order has been conceded by Block and that summary judgment should be granted on the claim. Even if the court were to permit Block to pursue the negligence theories he is now pursuing, defendants contend that they are still entitled to summary judgment because the evidence shows that defendants did not act negligently. Defendants argue that the undisputed evidence shows that Pre-Paid was not trying to prevent Block from engaging in the travel business, but was trying to prevent him from cross-recruiting other Pre-Paid associates into the travel business. Defendants contend that Block has admitted that the reason he was placed on hold was to investigate complaints of cross-recruiting. Defendants contend that Block has not presented any evidence that Pre-Paid told any associates that Block's involvement in the travel business violated the Associate Agreement. As to purportedly telling associates that

Block was cross-recruiting, defendants contend that the only evidence supporting that claim is the alleged communications involving Hefner and Stecki and that this evidence is inadmissible hearsay. Defendants also contend that Block's claim that he was placed on hold without a shred of credible evidence is not supported by the evidence. Defendants point out that Block has admitted that Long received reports from the field that Block was cross-recruiting. In addition, Pre-Paid received an e-mail from Block's ex-wife stating that he had recruited Larry Zimberg into YTB. Although Block complains that the letter is hearsay, Pre-Paid had a reasonable basis for placing a hold on Block. Further, defendants contend that the steps taken by Pre-Paid in placing Block on hold were authorized by the Associate Agreement. They assert that, as a matter of law, Pre-Paid's exercise of contract rights cannot amount to actionable negligence. Finally, defendants contend that the evidence establishes that Block did cross-recruit Larry Zimberg and that this evidence establishes that placing Block on hold did not amount to negligence.

The court need not decide whether plaintiff may pursue against defendants the negligence theories which were not set forth in the amended complaint. The court finds that defendants are entitled to summary judgment as to the negligence claim now alleged. The court concludes that even when viewed in a light most favorable to Block, the evidence in the record is not sufficient to establish that defendants, by placing Block on hold, were attempting to stop Block from engaging in a non-competing business venture. Although Long indicated in an e-mail in January 2007 that "[t]here is concern that you've gone to another network marketing company/companies," *see,* Ex. 3 to plaintiff's response, Long's last e-mail to Block, advising him that the hold had been removed, stated:

> My personal opinion is it's practically impossible to build another organization – in another MLM – without having some cross-recruiting occur, even if it's unintentional.

*     *     *     *

> Assuming you decide to go ahead with YTB, please
> understand the company will aggressively and quickly
> protect ourselves and our sales force if/when we confirm
> any cross-recruitment.

*Id.*   Moreover, Block has admitted in discovery responses and in deposition testimony that the reason he was placed on hold was because of false accusations and reports of cross-recruiting.  The court finds that there is insufficient evidence for a reasonable jury to find that Pre-Paid placed Block on hold to stop him from engaging in another multi-level marking business.

Block's negligence claim based upon statements to Pre-Paid associates and to least one customer fails for lack of admissible supporting evidence.  The evidence plaintiff relies upon to support that claim is based on Block's testimony as to statements made to him by Hefner, Stecki and Turner's mother about what Long and Pre-Paid employees said to them.  However, as previously discussed, the testimony constitutes inadmissible hearsay  – the testimony is being offered to prove the truth of the matter, i.e. that they besmirched his professional character.  The inadmissible hearsay cannot defeat a motion for summary judgment.  <u>Starr</u>, 54 F.3d at 1555.

As for the final theory of negligence, Block argues that defendants had a duty to conduct a reasonable investigation into the allegations of cross-recruiting before cutting off his commissions and impairing his ability to earn a living.  The tort of negligence requires the existence of a duty on the part of the defendant to protect the plaintiff from injury.  <u>Consolidated Grain & Barge Co. v. Structural Sys., Inc.</u>, 212 P.3d 1168, 1171 n. 8 (Okla. 2009).  The court recognizes that accompanying every contract is a common law duty to perform the thing agreed to be done with care, skill, reasonable expediency, and faithfulness.  <u>Oklahoma Natural Gas Co. v. Pack</u>, 97 P.2d 768, 770 (Okla. 1939).  However, the court finds that Block has failed to present any

24

authority to support a finding that a duty to conduct a reasonable investigation prior to placing Block on hold is based upon this common law duty. And Block has not presented any authority to support a conclusion that defendants have a duty, independent of the contract, to reasonably investigate allegations of cross-recruiting prior to placing him on hold. The court is not convinced that the contractual relationship of the parties in this case justifies the imposition of a duty to reasonably investigate allegations of cross-recruiting prior to placing Block on hold. Finally, the court has concluded that Pre-Paid did not breach the Associate Agreement in the ways alleged by Block. Since there was no breach of the contract, Block cannot assert a claim for negligent breach of contract on those grounds. <u>Union Pacific R. Co. v. U.S. ex rel. U.S. Army Corps of Engineers</u>, _____ F.3d __, 2010 WL 15985 *3 (10th Cir. January 5, 2010) ("[T]ortious negligent breach of contract is also a breach of the contract. If there is no breach of the contract, there is no tort.") The court therefore concludes that Pre-Paid is entitled to summary judgment as to the negligence claim.

As to Block's negligence claim against Stonecipher, the court likewise finds that summary judgment is appropriate. In addition to the foregoing, Block has not presented any evidence indicating that Stonecipher was involved in any of the alleged negligent acts.

In sum, the court concludes that defendants are entitled to summary judgment as to Block's negligence claim.

Conclusion

Based upon the foregoing, Defendants' Motion for Summary Judgment, filed November 9, 2009 (doc. no. 92) is **GRANTED in part** and **DENIED in part**. Plaintiff's defamation claim against Pre-Paid in regard to the "H" designation remains for trial.

ENTERED this 4th day of February, 2010.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

07-1304p035.wpd